## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MOAMMAR BADAWI DOKHAN,** | ) | |
| Detainee, United States Naval Station | ) | |
| at Guantánamo Bay, Cuba; and | ) | |
| | ) | |
| **SAMI AL HAJJ,** | ) | |
| as Next Friend of | ) | |
| Moammar Badawi Dokhan | ) | |
| | ) | |
| | ) | |
| *Petitioners/Plaintiffs,* | ) | **PETITION FOR A WRIT** |
| | ) | **OF HABEAS CORPUS** |
| *v.* | ) | |
| | ) | **CIVIL ACTION NO.** _____ |
| **GEORGE W. BUSH,** | ) | |
| President of the United States | ) | |
| The White House | ) | |
| 1600 Pennsylvania Ave., N.W. | ) | |
| Washington, D.C. 20500; | ) | |
| | ) | |
| **ROBERT M. GATES,** | ) | |
| Secretary, United States | ) | |
| Department of Defense | ) | |
| 1000 Defense Pentagon | ) | |
| Washington, D.C. 20301-1000; | ) | |
| | ) | |
| **REAR ADM. DAVID M. THOMAS, JR.,** | ) | |
| Commander, Joint Task Force – GTMO | ) | |
| JTF – GTMO | ) | |
| APO AE 09360; and | ) | |
| | ) | |
| **ARMY COL. BRUCE VARGO,** | ) | |
| Commander, Joint Detention | ) | |
| Group, JTF – GTMO | ) | |
| JTF – GTMO | ) | |
| APO AE 09360, | ) | |
| | ) | |
| *Respondents/Defendants.* | ) | |
| | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Moammar Badawi Dokhan ("Petitioner Dokhan") seeks the Great Writ. A Syrian citizen, Petitioner Dokhan is a civilian who has been wrongly classified as an "enemy combatant" by the President of the United States and is being held virtually *incommunicado* in military custody at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). He is being detained without lawful basis, without charge, and without access to counsel or to any fair process by which he might challenge his detention. Petitioner Dokhan acts on his own behalf and through his Next Friend Sami al Hajj. He is being held under color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as in violation of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner Dokhan or to establish in this Court a lawful basis for his detention. This Court should also order injunctive and declaratory relief.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or under the November 13, 2001, Executive Order, Respondents George W. Bush, President of the United States; Robert M. Gates, U.S. Secretary of Defense; Rear Admiral David M. Thomas, Jr., Commander of Joint Task Force – GTMO; and Army Colonel Bruce Vargo, Commander, Joint Detention Operations Group, Joint Task Force – GTMO (hereinafter collectively "Respondents") are ultimately responsible for the custody and control of Petitioner Dokhan or have been charged with the responsibility of maintaining custody and control of him while he is detained at Guantánamo.

Due to restrictions Respondents have placed on Petitioner Dokhan's access to counsel, undersigned counsel has been unable to meet with Petitioner Dokhan and has no reasonable prospect of being permitted to meet with Petitioner Dokhan without first filing this action.

2

Petitioner Dokhan therefore reserves the right to amend and/or supplement this Petition for a Writ of Habeas Corpus.

# I.
## JURISDICTION

1.      Petitioner Dokhan brings this action pursuant to 28 U.S.C. §§ 2241(a), (c)(1), (c)(3), and 2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; Articles I, II, and III of the United States Constitution; and the Fifth and Sixth Amendments to the U.S. Constitution.   Because Petitioner Dokhan seeks declaratory relief, he also relies on Fed. R. Civ. P. 57.

2.      This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus and to entertain the instant Petition under 28 U.S.C. § 2242.   This Court is further empowered to entertain the Petition pursuant to the United States Supreme Court's ruling in *Rasul v. Bush*, 542 U.S. 466 (2004).   This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201; to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction; and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

# II.
## DETAINEE TREATMENT ACT OF 2005 AND
## MILITARY COMMISSIONS ACT OF 2006

3.      On December 30, 2005, Respondent George W. Bush signed the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005) ("DTA").   Section 1005(e)(1) of the DTA amended 28 U.S.C. § 2241 to eliminate the jurisdiction of the federal courts to hear or consider petitions for Writs of Habeas Corpus and other actions brought by or on behalf of detainees held in Guantánamo filed after the date of its enactment.   In 2006, Congress enacted the Military Commissions Act ("MCA"), Pub. L. No.

3

109-366, 120 Stat. 2600, 2600-37 (2006).  Section 7(a) of the MCA amended 28 U.S.C. §

2241(e) to eliminate federal court jurisdiction to hear or consider petitions for Writs of Habeas

Corpus brought by or on behalf of an alien detainee "who has been determined by the United

States to have been properly detained as an enemy combatant or is awaiting such determination."

MCA § 7(a), 120 Stat. 2636.  Section 7(a) also eliminated federal court jurisdiction, except as

provided by § 1005(e)(2) and (3) of the DTA, over "any other action against the United States or

its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of

confinement" of such an alien.  The MCA provides that these amendments "shall apply to all

cases, without exception, pending on or after the date of the enactment of this Act, which relate

to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien

detained by the United States since September 11, 2001." MCA § 7(b), 120 Stat. 2636.

     4.     Section 1005(e)(2)(A) of the DTA granted the United States Court of Appeals for

the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final

decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as

an "enemy combatant."  Section 1005(e)(2)(C) also provided that the applicable "scope of

review" by the Court of Appeals is limited to determining whether a final CSRT decision "was

consistent with the standards and procedures specified by the Secretary of Defense," and "to the

extent the Constitution and laws of the United States are applicable, whether the use of such

standards and procedures to make the determination is consistent with the Constitution and laws

of the United States."

     5.     Section 1005(e) of the DTA fails to provide the full measure of process, rights,

and remedies required by the Suspension Clause of the United States Constitution, art. I, § 9,

cl. 2.

6.    Among other things, the CSRT process fails to provide an adequate substitute for habeas corpus. A CSRT is a non-adversarial hearing conducted pursuant to rules and procedures that are unfair in design and biased in practice. For example, under the CSRT rules and procedures, every detainee is:

(a)    Denied access to counsel;

(b)    Denied the right to see the evidence against him;

(c)    Denied the right to confront, or even know the identity of, his accusers;

(d)    Denied the right to call witnesses;

(e)    Denied the right to present evidence;

(f)    Denied the right to know how the military collected evidence; and

(g)    Denied an impartial tribunal because the CSRT must presume that evidence against a detainee (which he has not seen) is genuine and accurate.

The CSRT rules and procedures further allow for the consideration of hearsay evidence and/or evidence obtained by torture or coercion. These rules and procedures in practice and effect virtually compel the CSRT conclusion that the detainee is an "enemy combatant."

7.    The CSRTs are incapable of determining who is or is not properly detained by Respondents as an "enemy combatant." Even where a CSRT has determined that a detainee is "not/no-longer" an enemy combatant, the Defense Department has ordered a new CSRT convened, which then found the detainee to be an enemy combatant. In one instance, a detainee was found to be no longer an enemy combatant by two successive CSRTs, and thus a third CSRT was convened, which then found the detainee to be an enemy combatant. Further, when a detainee has been found not/no-longer an enemy combatant, the detainee is not told of his favorable decision and may not be informed of or participate in subsequent hearings. *See* Mark

Denbeaux & Josh Denbeaux, *No-Hearing Hearings: An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* 3, 37-39, *available at* http://law.shu.edu/news/final_no_hearing_hearings_report.pdf.

8.      The CSRT rules and procedures promulgated by Respondents are inconsistent with the Constitution, the laws and treaties of the United States, and customary international law.

9.      In addition to the CSRTs, detainees are also subject to an annual Administrative Review Board ("ARB"), with the purported purpose of determining "if enemy combatants detained by the Department of Defense at the U.S. Naval Base, Guantanamo Bay, Cuba should be released, transferred, or continue to be detained." Sec'y for Def., Memorandum for Secretaries of the Military Departments et al., Revised Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba 1 (Jul. 14, 2006) (footnote omitted).  The ARBs use a procedure similar to that of the CSRTs and are equally incapable of determining who is or is not properly detained by Respondents as an "enemy combatant."

10.      Upon information and belief, Petitioner Dokhan was subject to a CSRT, as described above, on or about October 12, 2004.  Upon information and belief, Petitioner Dokhan was subject to an ARB, as described above, on or about September 19, 2005 and was subject to a second ARB on or about May 17, 2006.  Upon information and belief, Petitioner Dokhan's CSRT was not properly conducted in accordance with the CSRT rules and procedures promulgated or required to be promulgated by Respondents, and the conclusion of the CSRT that Petitioner Dokhan is an "enemy combatant" is not supported by a preponderance of the evidence. Upon information and belief, Petitioner Dokhan's ARBs were not conducted properly in accordance with the ARB rules and procedures promulgated or required to be promulgated by Respondents and wrongly concluded that Petitioner Dokhan should continue to be detained.

11.    Section 1005(e) of the DTA and sections 7(a) and (b) of the MCA are unconstitutional on their face and as applied to Petitioner Dokhan because they violate the Suspension Clause of the United States Constitution, art. I, § 9, cl. 2.    The Suspension Clause prevents Congress from abrogating Guantánamo detainees' access to the Great Writ.    Further, review of CSRT determinations under the DTA does not provide a constitutionally adequate substitute for habeas corpus review.    Section 1005(e) of the DTA and sections 7(a) and (b) of the MCA therefore do not deprive this Court of jurisdiction to hear and decide this Petition, as well as to grant the relief that Petitioner Dokhan seeks herein.

12.    This Court has jurisdiction over Petitioner Dokhan's habeas petition notwithstanding the decision of the United States Court of Appeals for the District of Columbia Circuit in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 127 S. Ct. 3087 (2007).    In *Boumediene*, the D.C. Circuit held that the jurisdiction stripping provisions of the Military Commissions Act do not violate the Suspension Clause.    That case, however, is currently pending before United States Supreme Court.    *Boumediene v. Bush*, 127 S. Ct. 3087 (2007) (granting writ of certiorari).    Since that time, the D.C. Circuit has held in *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), that, pending Supreme Court review in *Boumediene*, the district court retains jurisdiction over habeas petitions filed by Guantánamo detainees in order to grant interim relief.

## III.
## PARTIES

13.    Petitioner Dokhan is a citizen of Syria who is presently detained and held unlawfully in Respondents' custody and control at Guantánamo under the ISN #317.

14.    Petitioner's Next Friend is Sami al Hajj, who upon information and belief was also a detainee at Guantánamo until being released earlier this year.    Sami al Hajj acts as Next Friend to Petitioner Dokhan because Petitioner Dokhan has been denied access to legal counsel

and to the courts of the United States, is not familiar with the U.S. legal system or U.S. customs, and is unable to have a family member perform this task. Sami al Hajj acts as Next Friend in order to assist Petitioner in seeking redress for his grievances. *See* Exhibit A.

15.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States military. Petitioner Dokhan is being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001) ("Executive Order"). President Bush is responsible for Petitioner Dokhan's unlawful detention and is sued in his official capacity.

16.    Respondent Robert M. Gates is the Secretary of the United States Department of Defense. Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or, alternatively, pursuant to the Executive Order, Respondent Gates has been charged with maintaining the custody and control of Petitioner Dokhan. He is sued in his official capacity.

17.    Respondent Rear Admiral David M. Thomas, Jr., is the Commander of Joint Task Force – GTMO, the task force running the detention operation at Guantánamo Bay. He has supervisory responsibility for Petitioner Dokhan and is sued in his official capacity.

18.    Respondent Army Colonel Bruce Vargo is the Commander of the Joint Detention Operations Group and the JTF — GTMO detention camps, including the U.S. facility where Petitioner Dokhan is presently held. He is the immediate custodian responsible for Petitioner Dokhan's detention and is sued in his official capacity.

19.    Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or of agents or employees of

8

private contractors ("contractor employees") with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents or employees, or contractor employees.

## IV.
## STATEMENT OF FACTS

20.     Upon information and belief, Petitioner Dokhan is not and never has been an "enemy combatant" who was "part of or supporting Taliban or Al-Queda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." Deputy Sec'y for Def., Memorandum for Secretaries of the Military Departments et al., Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base, Guantanamo Bay, Cuba enclosure 1, at 2 (Jul. 14, 2006) (defining "enemy combatant" for purposes of Combatant Status Review Tribunal process). Petitioner Dokhan has never "committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." *Id.*

21.     Petitioner Dokhan seeks to enforce his right to a judicial determination by an appropriate and lawful authority as to whether there is a cognizable legal and factual basis for Respondents' determination that he is either an "enemy combatant" as defined by the United States Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), or an "enemy combatant" as that term is defined and used by the Executive in the Combatant Status Review Tribunals.

22.     Upon information and belief, at the time of his seizure and detention, Petitioner Dokhan was not a member of Al Qaeda or the Taliban government's armed forces. Upon information and belief, he was not involved, directly or indirectly, in the terrorist attacks on the United States on September 11, 2001, in the ensuing armed conflict, or in any act of international terrorism attributed by the United States to Al Qaeda.

23.    Upon information and belief, Petitioner Dokhan remains in detention at Guantánamo, a territory over which the United States exercises exclusive jurisdiction and control.

24.    Upon information and belief, Petitioner Dokhan has not been afforded any procedures that would satisfy his rights under the fundamental common law notions of due process, the Constitution, laws and treaties of the United States, or customary international law.

25.    Upon information and belief, Petitioner Dokhan desires to pursue in U.S. courts every available legal challenge to the lawfulness of his detention.

### The Authorization for the Use of Military Force

26.    In the wake of the September 11, 2001 attacks, the United States, at the direction of President Bush, began a massive military campaign against the Taliban government, then in power in Afghanistan.   On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against those "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF").

27.    Upon information and belief, Petitioner Dokhan did not participate in the armed conflict at any point in time.   Consequently, he is not properly detained pursuant to the AUMF, President Bush's authority as Commander-in-Chief, or the laws and usages of war.

### The Executive Order

28.    On November 13, 2001, Respondent Bush issued an Executive Order authorizing the Secretary of Defense to detain indefinitely anyone Respondent Bush has "reason to believe":

    (i)     is or was a member of the organization known as al Qaeda;

    (ii)    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation thereof, that have

caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii)    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833 § 2 (Nov. 13, 2001). President Bush must make this determination in writing. The Executive Order was neither authorized nor directed by Congress, and is beyond the scope of the AUMF.

29.    The Executive Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Executive Order contains no provision for that person to be notified of the charges he may face or the basis of his detention. The Executive Order authorizes detainees to be confined indefinitely without charges or the opportunity to challenge the basis for their detention. It contains no provision for a detainee to be notified of his rights under domestic and international law. It provides no means for a detainee to contact and secure counsel, no rights to notice of consular protection, and no rights to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the basis for or the legality of a detainee's continued detention and contains no provision for recourse to an Article III court. The United States Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004), implicitly invalidated the Executive Order's provision barring federal review of the legality of the detainees' imprisonment. The Executive Order purports to authorize indefinite and unreviewable detention, based on nothing more than President Bush's written determination that an individual is subject to its terms.

30.    The Executive Order was promulgated in the United States and in this judicial district; the decision to detain Petitioner Dokhan was made by Respondents in the United States and in this judicial district; the decision to detain Petitioner Dokhan at Guantánamo was made in

11

the United States and in this judicial district; and the decision to continue detaining Petitioner Dokhan was, and is, being made by Respondents in the United States and in this judicial district.

31.     Upon information and belief, President Bush has never certified or determined in any manner, in writing or otherwise, that Petitioner Dokhan is subject to the Executive Order.

32.     Petitioner Dokhan is not properly subject to the Executive Order, and, in any event, the Executive Order is unjust, *ultra vires*, and violates the laws, treaties, and Constitution of the United States, as well as customary international law.  Respondents have unlawfully detained Petitioner Dokhan purportedly pursuant to President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

### Guantánamo Bay Naval Station

33.     On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba.  In April 2002, prisoners were transferred to Camp Delta, a more permanent prison facility at Guantánamo.  Currently, some prisoners are housed in Camp Delta, some are housed at Camp 4, and some are housed at Camp 5 and Camp 6, which are modern maximum-security prison facilities.

34.     Prisoners detained at Guantánamo are entitled to test the legality of their detention in the federal courts. *See Rasul v. Bush*, 542 U.S. 466 (2004).

35.     On a date unknown to counsel, but known to Respondents, the United States military transferred Petitioner Dokhan to Guantánamo, where he has been held ever since in the custody and control of Respondents.

### The Conditions of Detention at Guantánamo

36.     Upon information and belief, since gaining control of Petitioner Dokhan, the United States military has held him virtually *incommunicado*.

37.     Upon information and belief, Petitioner Dokhan has been or will be interrogated repeatedly by agents of the United States Department of Defense, Department of Justice, and the Central Intelligence Agency, though he has not been charged with an offense and has not been notified of any pending or contemplated charges. He has not appeared before any lawful military or civilian tribunal and has not been provided access to counsel. He has not been adequately informed of his rights under the U.S. Constitution, the laws of the United States, the regulations of the U.S. military, the Geneva Conventions, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of Refugees, or customary international law. Respondents have taken the position that Petitioner Dokhan should not be informed of these rights. As a result, Petitioner Dokhan lacks any ability to protect or to vindicate his rights under domestic and international law.

38.     Upon information and belief, Petitioner Dokhan has been forced to provide involuntary statements to Respondents' agents at Guantánamo.

39.     Upon information and belief, Petitioner Dokhan has been held under conditions that violate his constitutional and international rights to dignity and freedom from torture and from cruel, inhuman, and degrading treatment or punishment.

40.     Many of the violations that have occurred at Guantánamo Bay—including isolation for up to thirty days, twenty-hour interrogations, extreme and prolonged stress positions, sleep deprivation, sensory assaults, nudity, hooding, and the use of dogs to create anxiety and terror—were actually interrogation techniques recommended for use at Guantánamo by then general counsel of the U.S. Department of Defense, William J. Haynes II, and approved by Secretary of Defense Donald Rumsfeld. *See* Action Memo from William J. Haynes II, General Counsel, DOD, to Secretary of Defense (Nov. 27, 2002) (approving fifteen out of

13

eighteen proposed techniques of aggressive interrogation); *see also* Philippe Sands, *The Green Light*, Vanity Fair, May 2008, *available at* http://www.vanityfair.com/politics/features/2008/05/guantanamo200805. The harsh interrogation techniques were approved in a March 2003 legal memorandum prepared by John C. Yoo, then the second-ranking official at the Office of Legal Counsel at the Justice Department. *See* Mark Mazetti, *'03 U.S. Memo Approved Harsh Interrogations*, N.Y. Times, Apr. 2, 2008, *available at* http://www.nytimes.com/2008/04/02/washington/02terror.html. Written to Haynes, who sought guidance on the "legal standards governing military interrogations" at Guantánamo, the Yoo memo gave the military broad latitude to use harsh interrogation tactics and argued that many U.S. and international laws would not apply to military interrogations conducted overseas. *Id.* Though subsequently rescinded, the Yoo memo purported to provide a legal foundation for the use of coercive techniques on Guantánamo detainees. *Id.*

41.     The harsh tactics approved at the highest levels of the Justice Department and the Department of Defense were used in the interrogations of an unknown number of Guantánamo detainees. For instance, an internal log obtained by news organizations details the interrogation of detainee Mohammed al-Qahtani, which spanned fifty days from November 2002 to early January 2003. *See* Adam Zagorin & Michael Duffy, *Inside the Interrogation of Detainee 063*, Time, June 12, 2005, *available at* http://www.time.com/time/magazine/article/0,9171,1071284-1,00.html. The techniques described by the log as having been used in the interrogation of al-Qahtani include all fifteen approved by Secretary Rumsfeld. *See* Sands, *The Green Light*, *supra*.

42.     In a confidential report to the United States government, the International Committee of the Red Cross ("ICRC") charged the United States military with intentional use during interrogations of psychological and physical coercion on prisoners at Guantánamo that is "tantamount to torture." *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*,

N.Y. Times, Nov. 30, 2004, at A1.  The report includes claims that doctors and other medical workers at Guantánamo participated in planning for interrogations.  *Id.*; *see also* M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, N. Engl. J. Med., Jan. 6, 2005, at 3–4.

43.    Since details of the ICRC's report emerged, new revelations of abuse and torture at Guantánamo have appeared, including F.B.I. memos detailing torture and "highly aggressive interrogation techniques" including twenty-four-plus hour interrogations involving temperature extremes, beatings, "short-shackling" of detainees to the floor, prolonged isolation, and loud music.  *See* Carol D. Leonnig, *Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos*, Wash. Post, Dec. 26, 2004, at A1; Neil A. Lewis & David Johnston, *New F.B.I. Memos Describe Abuses of Iraq Inmates*, N.Y. Times, Dec. 21, 2004, at A1.  Recently, the Office of the Inspector General of the U.S. Department of Justice released a report detailing major clashes between the F.B.I. and other agencies over the rough tactics used by military interrogators at Guantánamo.  *See* U.S. Dep't of Justice, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq*, May 2008, *available at* http://graphics8.nytimes.com/packages/pdf/washington/20080521_DETAIN_report.pdf; *see also* Eric Lichtblau & Scott Shane, *Report Details Interrogation Debate*, N.Y. Times, May 21, 2008, *available at* http://www.nytimes.com/2008/05/21/washington/20cnd-detain.html?scp=1&sq=%22Report%20Details%20Complaints%20Over%20Interrogations%22&st=cse ("One bureau memorandum spoke of 'torture techniques' used by military interrogators. Agents described seeing things like inmates handcuffed in a fetal position for up to 24 hours, left to defecate on themselves, intimidated by dogs, made to wear women's underwear and subjected to strobe lights and extreme heat and cold.").

44.    Department of Defense investigators have confirmed allegations that female Guantánamo interrogators have repeatedly used aggressive sexual tactics in attempts to humiliate and pry information from Muslim detainees. *See* Carol D. Leonnig & Dana Priest, *Detainees Accuse Female Interrogators: Pentagon Inquiry is Said to Confirm Muslims' Accounts of Sexual Tactics at Guantanamo*, Wash. Post, Feb. 10, 2005, at A1 ("The women rubbed their bodies against the men, wore skimpy clothes in front of them, made sexually explicit remarks and touched them provocatively[.]").

45.    In fact, many of the egregious interrogation techniques used in the Abu Ghraib detention center and other detention facilities in Iraq—such as using aggressive dogs to intimidate detainees, sexually humiliating detainees, placing detainees in stress positions, and subjecting detainees to conditions designed to cause sensory deprivation—were pioneered at Guantánamo. *See* Josh White, *Abu Ghraib Dog Tactics Came From Guantanamo: Testimony Further Links Procedures at 2 Facilities*, Wash. Post, July 27, 2005, at A14; Josh White, *Abu Ghraib Tactics Were First Used at Guantanamo*, Wash. Post, July 14, 2005, at A1.

46.    The unlawful and unconstitutional interrogation techniques used by Respondents at Guantánamo include not only physical and psychological abuse but also other impermissible conduct that is contrary to the requirements of due process, including, upon information and belief, having agents of the government present themselves as lawyers for the detainees during meetings with the detainees, for the purpose of extracting information from the detainees. *See* Sam Hannel, *Lawyers Describe Guantánamo Detainees*, Seattle Post-Intelligencer, Jan. 19, 2005.

47.    Respondents, acting individually or through their agents, have stated that the limitations applicable to coercive interrogation techniques used by United States military officials under the auspices of the Department of Defense *do not apply* to interrogations

conducted by agents of the CIA or other entities under President Bush. *See* Eric Lichtblau, *Gonzales Says '02 Policy on Detainees Doesn't Bind CIA*, N.Y. Times, Jan. 19, 2005, at A17; Dan Eggen & Charles Babington, *Torture by U.S. Personnel Illegal, Gonzales Tells Senate*, Wash. Post, Jan. 18, 2005, at A4.

48.    Senior Department of Defense officials have acknowledged that Guantánamo detainees may be held indefinitely, even if they are prosecuted by military commission and subsequently acquitted of all charges against them. *See* Jeffrey Toobin, *Camp Justice*, New Yorker,           Apr.           14,           2008,           *available           at* http://www.newyorker.com/reporting/2008/04/14/080414fa_fact_toobin.    Brigadier General Thomas W. Hartmann, the legal adviser to the Department of Defense's Office of Military Commissions, has stated that even detainees acquitted by military commissions may not be released: "We are trying these alleged war criminals during the war. So, in order to protect our troops in the field, in general we are not going to release anyone who poses a danger until the war is over." *Id.*

49.    Counsel for Respondents have also consistently maintained that the United States may hold detainees like Petitioner Dokhan under their current conditions indefinitely. *In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK), *et al.*, (D.D.C.), Tr. of Dec. 1, 2004 Oral Argument on Motion to Dismiss at 22-24, statements of Principle Deputy Assoc. Att'y Gen. Brian Boyle; *see also* Dana Priest, *Long-Term Plan Sought for Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1. Moreover, the U.S. government has constructed new, permanent facilities at Guantánamo—Camp 5 and Camp 6—which are modeled on modern high-security federal prisons. *See* Toobin, *Camp Justice*, *supra*.

50.    During interrogations, detainees have also been threatened with rendition or transfer to countries that permit indefinite detention without charge or trial and/or routinely

17

practice torture. Upon information and belief, the United States has secretly transferred

detainees to such countries without complying with the applicable legal requirements for

extradition. This practice, known as "extraordinary rendition," is used to facilitate interrogation

by subjecting detainees to torture. *See* Jane Mayer, *Outsourcing Torture: The Secret History of*

*American's "Extraordinary Rendition" Program*, New Yorker, Feb. 14, 2005, at 106.

      51.    The United States government's practice of extraordinary rendition has been well

documented by major American and international news organizations, including, *inter alia*, the

*Washington Post*, the *Los Angeles Times*, and the British Broadcasting Corporation ("BBC").

According to news accounts:

> Since September 11, the U.S. government has secretly transported dozens
> of people suspected of links to terrorists to countries other than the United
> States bypassing extradition procedures and legal formalities, according to
> Western diplomats and intelligence source. The suspects have been taken
> to countries . . . whose intelligence services have close ties to the CIA and
> where they can be subjected to interrogation tactics — including torture
> and threats to families — that are illegal in the United States, the sources
> said. In some cases, U.S. intelligence agents remain closely involved in
> the interrogations, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post,

Mar. 11, 2002, at A1; *see also* Dana Priest, *Long Term Plan Sought for Terror Suspects*, Wash.

Post, Jan. 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements between

the United States and other countries, such as Egypt . . ., that agree to have local security services

hold certain suspects in their facilities for interrogation by CIA and foreign liaison officers.").

      52.    Upon information and belief, Petitioner Dokhan is at risk of being rendered,

expelled, or returned without legal process to his native Syria or another country where he will

be tortured and/or detained indefinitely. Syria has a well-documented history of human rights

abuses. The U.S. State Department's *Country Reports on Human Rights Practices – 2007*,

dated March 11, 2008, for Syria documents serious human rights abuses by the Syrian

government, including arbitrary and unlawful killings and torture and physical abuse of prisoners by the Syrian security forces. *See* Syria, Country Reports on Human Rights Practices – 2007, *available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100606.htm (Mar. 11, 2008). The State Department's report notes that during 2007 "three persons died in detention following torture or mistreatment by security services." *Id.* The report further notes that "security forces continued to use torture frequently." *Id.* According to the report, methods of torture used by the government of Syria include "electrical shocks; pulling out fingernails; burning genitalia; forcing objects into the rectum; beating, sometimes while the victim was suspended from the ceiling; alternately dousing victims with freezing water and beating them in extremely cold rooms; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; using a backward-bending chair to asphyxiate the victim or fracture the victim's spine; and stripping prisoners naked for public view." *Id.* Similarly, the most recent country report on Syria from Amnesty International observes that "[t]orture and ill-treatment in detention continued to be reported and carried out with impunity." Amnesty International USA, 2007 Annual Report for Syria, *available at* http://www.amnestyusa.org/annualreport.php?id=ar&yr=2007&c=SYR.

53.    U.S. authorities have already transferred at least one individual to Syria without legal process, Canadian citizen Maher Arar. While in Syria, Mr. Arar was imprisoned and repeatedly tortured by Syrian authorities. As the *New York Times* has reported, the Syrian-born Arar was seized at Kennedy airport on September 26, 200, transferred to Jordan, and then to Syria, where he was held for 10 months and repeatedly beaten and tortured before Syrian officials concluded that he had no connection to terrorism. Ian Austin, *Canadians Fault U.S. for Its Role in Torture*, N.Y. Times, Sept. 19, 2006, *available at* http://www.nytimes.com/2006/09/19/world/americas/19canada.html. Mr. Arar's transfer by U.S.

authorities to Syria and torture by Syrian authorities was confirmed by a 2006 report of a special Canadian government commission headed by Justice Dennis R. O'Connor, Associate Chief Justice of Ontario. *See Report of the Events Relating to Maher Arar: Analysis and Recommendations* 9 (2006), *available at* http://www.ararcommission.ca/eng/AR_English.pdf ("On September 26, 2002, while passing through John F. Kennedy International Airport in New York, Mr. Arar was arrested and subsequently detained by American officials for 12 days. He was then removed against his will to Syria, the country of his birth, where he was imprisoned for nearly a year. While in Syria, Mr. Arar was interrogated, tortured and held in degrading and inhumane conditions."). Mr. Arar was tortured by Syrian authorities notwithstanding the fact that U.S. officials obtained assurances from Syria that Mr. Arar would not be tortured. *See* Dana Priest, *Man Was Deported After Syrian Assurances*, Wash. Post, Nov. 20, 2003, at A24.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (ARTICLE I — VIOLATION OF THE SUSPENSION CLAUSE)

54. Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

55. Respondents' arrest and continued detention of Petitioner Dokhan violates the United States Constitution, Habeas Corpus Suspension Clause, Art. I, § 9, cl. 2, because the Suspension Clause guarantees access to the Writ and robust and independent factual and legal review of executive detention. Petitioner Dokhan has been and continues to be detained without access to the Writ and without robust and independent factual and legal review of his detention.

56. Respondents have seized and continue to detain Petitioner Dokhan without affording him fundamental due process.

20

57.    To the extent that the DTA and MCA purport to remove this Court's jurisdiction over Petitioner Dokhan's habeas petition challenging the legality of his detention, Respondent's actions constitute an unlawful Suspension of the Writ of Habeas Corpus, in violation of Article I, § 9, cl. 2 of the United States Constitution.

58.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## SECOND CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION — UNLAWFUL CONDITIONS OF CONFINEMENT)

59.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

60.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner Dokhan to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

61.    Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief as well as any other relief the Court may deem appropriate.

## THIRD CLAIM FOR RELIEF

### (ARTICLE II OF THE UNITED STATES CONSTITUTION — UNLAWFUL DETENTION)

62.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

63.    Upon information and belief, Petitioner Dokhan is not and has never been an enemy alien, lawful or unlawful belligerent, or combatant of any kind.  The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the

theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004).

64.    By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering, and directing that military officials seize Petitioner Dokhan and transfer him to military detention, and by authorizing and ordering his continued military detention at Guantánamo.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner Dokhan.

65.    The military seizure and detention of Petitioner Dokhan by the Respondents is *ultra vires* and illegal because it is in violation of Article II of the United States Constitution.  To the extent that the Executive asserts that Petitioner Dokhan's detention is authorized by the Executive Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner Dokhan.

66.    To the extent that Respondents assert that their authority to detain Petitioner Dokhan derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

67.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## FOURTH CLAIM FOR RELIEF

### (FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION — VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

68.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

69.     Upon information and belief, Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner Dokhan's right to consult with counsel by conditioning counsel's access to Petitioner Dokhan on unreasonable terms, including classification and declassification procedures, in violation of Petitioner Dokhan's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

70.     Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## FIFTH CLAIM FOR RELIEF

### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION — RENDITION)

71.     Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

72.     Upon information and belief, Petitioner Dokhan is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture.  The transfer of Petitioner Dokhan to a country where he faces a foreseeable and direct risk that he will be tortured constitutes a violation of Petitioner Dokhan's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

73.     Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate, including preliminary injunctive relief.

## SIXTH CLAIM FOR RELIEF

### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION — UNLAWFUL DEPRIVATION OF LIBERTY)

74.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

75.    By the actions described above, Respondents, acting under color of law, have violated and continue to violate the Due Process Clause of the Fifth Amendment to the Constitution of the United States as well as common law principles of due process, including due process principles reflected in the law of armed conflict, the law of war, and international humanitarian law.  President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals including Petitioner Dokhan, without due process of law, and the remaining Respondents have implemented those orders.  Respondents' actions have violated and continue to violate both the Due Process Clause and common law principles of due process as reflected in, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

76.    To the extent that Petitioner Dokhan's detention purports to be authorized by the Executive Order, that Order violates the Fifth Amendment to the United States Constitution on its face and as applied to Petitioner Dokhan.

77.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## SEVENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE — TORTURE)

78.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

79.    Upon information and belief, by the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about acts that deliberately and intentionally inflicted severe physical and psychological abuse and agony upon Petitioner Dokhan in order to obtain coerced information or confessions from him, to punish or intimidate Petitioner Dokhan, or for other purposes.  Upon information and belief, Petitioner Dokhan has been, among other abuses: held in and surrounded by conditions of isolation; left constantly vulnerable to repeated interrogation and severe beatings; threatened with or experienced the reality of being kept in a cage with no privacy; shackled with heavy chains and irons; placed in solitary confinement or the threat of solitary confinement for prolonged periods of time because of minor rule infractions; interrogated while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and subjected to repeated psychological abuse.

80.    The acts described herein constitute violations of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violate customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

81.    Upon information and belief, Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against Petitioner Dokhan.

82. Upon information and belief, Petitioner Dokhan was forced to suffer severe physical and psychological abuse and agony and is entitled to habeas, declaratory, and injunctive relief, and other relief to be determined at trial.

### EIGHTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE — WAR CRIMES)

83. Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

84. Upon information and belief, by the actions described above, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of Petitioner Dokhan constitute war crimes and/or crimes against humanity in violation of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated, among others, the Fourth Geneva Convention, Common Article III of the Geneva Conventions, and Additional Protocols I and II of the Geneva Conventions as well as customary international law prohibiting war crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decisions, and other authorities.

85. Upon information and belief, as a result of Respondents' unlawful conduct, Petitioner Dokhan has been and is forced to suffer severe physical and psychological abuse and agony, and is therefore entitled to declaratory and injunctive relief, and such other relief as the Court may deem appropriate.

### NINTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE —
### CRUEL, INHUMAN, OR DEGRADING TREATMENT)

86.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

87.    Upon information and belief, the acts described herein had the intent and the effect of grossly humiliating and debasing Petitioner Dokhan, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance.

88.    The acts described herein constitute cruel, inhuman, or degrading treatment in violation of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman, or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

89.    Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman, or degrading treatment of Petitioner Dokhan.

90.    Upon information and belief, Petitioner Dokhan was forced to suffer severe physical and psychological abuse and agony and is entitled to declaratory and injunctive relief as well as other relief to be determined at trial.

### TENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE — ARBITRARY ARREST
### AND PROLONGED ARBITRARY DETENTION)

91.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

92.    The acts described herein constitute arbitrary arrest and detention of Petitioner Dokhan in violation of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

93.    Upon information and belief, Respondents directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Petitioner Dokhan in violation of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

94.    Upon information and belief, as a result of Respondents' unlawful conduct, Petitioner Dokhan has been and is being deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse. Petitioner Dokhan is therefore entitled to habeas, declaratory, and injunctive relief, and such other relief as the Court may deem appropriate.

## ELEVENTH CLAIM FOR RELIEF

### (ALIEN TORT STATUTE – FORCED DISAPPEARANCE)

95.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

96.    Upon information and belief, by the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the forced disappearance

of Petitioner Dokhan in violation of the his rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

97.    Upon information and belief, as a result of Respondents' unlawful conduct, Petitioner Dokhan has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to habeas, declaratory, and injunctive relief and such other relief as the Court may deem appropriate.

**TWELFTH CLAIM FOR RELIEF**

**(ALIEN TORT STATUTE — RENDITION)**

98.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

99.    Upon information and belief, Petitioner Dokhan is at risk of being rendered, expelled, or returned without lawful procedures to a country that engages in torture.  The transfer of the Petitioner Dokhan to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner Dokhan's rights under the law of nations, which may be vindicated under the Alien Tort Statute, 28 U.S.C. § 1350.

100.    Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate, including preliminary injunctive relief.

**THIRTEENTH CLAIM FOR RELIEF**

**(VIOLATION OF THE APA — ARBITRARY
AND CAPRICIOUS UNLAWFUL DETENTION)**

101.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

102.    Army Regulation 190-8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See, e.g.*, Army Reg. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

103.    By arbitrarily and capriciously detaining Petitioner Dokhan in military custody for over four years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

104.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

### FOURTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA — ARBITRARY
### AND CAPRICIOUS DENIAL OF DUE PROCESS)

105.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

106.    Upon information and belief, by the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner Dokhan the process accorded to persons seized and detained by the United States military in times of armed conflict as established by Army Regulation 190-8. By doing so, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

107.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the Court may deem appropriate.

## FIFTEENTH CLAIM FOR RELIEF

### (VIOLATION OF THE APA — TORTURE AND CRUEL, INHUMAN OR DEGRADING TREATMENT)

108.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

109.    Upon information and belief, by the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioner Dokhan to torture and/or cruel, inhuman, or degrading treatment in violation of Army Regulation 190-8.    By doing so, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

110.    Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

## SIXTEENTH CLAIM FOR RELIEF

### (GENEVA CONVENTIONS — ARBITRARY DENIAL OF DUE PROCESS)

111.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

112.    By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner Dokhan the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

113.    Violations of the Geneva Conventions are direct treaty violations and are also violations of customary international law. As such, they constitute enforceable claims under 28 U.S.C. § 2241(c)(3) (stating that the writ of habeas corpus shall extend to a prisoner if "[h]e is in custody in violation of the Constitution or laws or *treaties* of the United States" (emphasis added)).

114.    Respondents set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

115.    Accordingly, Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## SEVENTEENTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW — ARBITRARY DENIAL OF DUE PROCESS)

116.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

117.    By the actions described above, Respondents have denied and continue to deny Petitioner Dokhan the process due to persons seized and detained by the United States under the International Covenant on Civil and Political Rights, adopted Dec. 16, 1966, S. Exec. Doc. No. E, 95-2 (1978), 999 U.N.T.S. 171, the American Convention on Human Rights, Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, the Universal Declaration of Human Rights, G.A. Res. 217A, at 71, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc A/810 (Dec. 12, 1948), the American Declaration of the Rights and Duties of Man, OAS Doc. OAS/Ser.L/V/I.4 rev. 9 (1948), and as established by customary international humanitarian and human rights law as reflected, expressed, and defined in these and other multilateral treaties, other international instruments, domestic judicial decisions, and other authorities.

118.    Because Respondents are detaining Petitioner Dokhan "under or by color of the authority of the United States" and "in violation of the Constitution or laws or treaties of the United States," Petitioner Dokhan's claim arises under 28 U.S.C. § 2241(c)(3), and he is entitled to habeas relief.

119.    Petitioner Dokhan is entitled to habeas, declaratory, and injunctive relief as well as any other relief the Court may deem appropriate.

## EIGHTEENTH CLAIM FOR RELIEF

### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW — TORTURE AND CRUEL, INHUMAN, OR DEGRADING TREATMENT)

120.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

121.    Upon information and belief, the acts described herein had the intent and the effect of grossly humiliating and debasing Petitioner Dokhan, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance, in violation of the International Covenant on Civil and Political Rights, adopted Dec. 16, 1966, S. Exec. Doc. No. E, 95-2 (1978), 999 U.N.T.S. 171, the American Convention on Human Rights, Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, the Universal Declaration of Human Rights, G.A. Res. 217A, at 71, U.N. GAOR, 3d Sess., 1st plen. mtg., U.N. Doc A/810 (Dec. 12, 1948), the American Declaration of the Rights and Duties of Man, OAS Doc. OAS/Ser.L/V/I.4 rev. 9 (1948), and customary international humanitarian and human rights law as reflected, expressed, and defined in these and other multilateral treaties, other international instruments, domestic judicial decisions, and other authorities.

122.    Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate.

## NINETEENTH CLAIM FOR RELIEF

### (CONVENTION AGAINST TORTURE AND CONVENTION RELATING TO THE STATUS OF REFUGEES — RENDITION)

123.    Petitioner Dokhan incorporates by reference all preceding paragraphs as if set forth fully herein.

124.    Upon information and belief, Petitioner Dokhan is at risk of being rendered, expelled. or returned without lawful procedures to a country that engages in torture. The transfer of Petitioner Dokhan to a country where he faces a foreseeable and direct risk that he will be tortured constitutes a direct violation of Petitioner Dokhan's rights under the Covention Against Torture and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150, *entered into force* Apr. 22, 1954.

125.    Accordingly, Petitioner Dokhan is entitled to declaratory and injunctive relief, as well as any other relief the Court may deem appropriate, including preliminary injunctive relief.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Petitioner Dokhan prays for relief as follows:

1.    Designate Sami al Hajj as the Next Friend of Petitioner Dokhan;

2.    Grant the Writ of Habeas Corpus and order Respondents to release Petitioner Dokhan from his current unlawful detention;

3.    Order that Petitioner Dokhan immediately be brought before the Court or before a Magistrate Judge assigned by the Court at a convenient facility to conduct proceedings under the supervision of the Court to vindicate his rights;

4.    Order that Petitioner Dokhan cannot be transferred to any other country while this action is pending without the specific, written agreement of Petitioner Dokhan and Petitioner Dokhan's counsel;

5.     Order that Petitioner Dokhan cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioner Dokhan will be subject to torture;

6.     Order Respondents to allow counsel immediately to meet and confer with Petitioner Dokhan, in private and unmonitored attorney-client conversations;

7.     Order Respondents to cease all interrogations of Petitioner Dokhan, direct or indirect, while this litigation is pending;

8.     Order Respondents to cease all acts of torture; cruel, inhuman, and degrading treatment; and outrages upon the personal dignity of Petitioner Dokhan;

9.     Order and declare that Section 1005(e) of the DTA and Sections 7(a) and (b) of the MCA violate the Habeas Corpus Suspension Clause of the United States Constitution;

10.     To the extent that the Executive asserts that Petitioner Dokhan's detention is authorized by the Executive Order, order and declare the Executive Order of November 13, 2001, is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the United States Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States, and customary international law;

11.     Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner Dokhan without due process is arbitrary, unlawful, and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international human rights and humanitarian law, including customary international law that may be vindicated under the Alien Tort Statute; and

35

12.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner Dokhan's rights under the United States Constitution, federal statutory law, the common law, and international law.

Dated: June 9, 2008

Respectfully submitted,

Counsel for Petitioner:

Kristine A. Huskey
D.C. Bar ID #462979
National Security & Human Rights Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Tel: 512-232-3657
Fax: 512-471-0800

Shayana D. Kadidal
D.C. Bar ID #454248
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York  10012
Tel: 212-614-6438
Fax: 212-614-6499

**EXHIBIT  A**

# FOUO

## GUANTANAMO BAY

I, SAMI AL HAJJ, hereby state that I am familiar with the American legal concept of 'next friend' and I wish to act as next friend for the following prisoners who are being held here in Guantanamo Bay. The Department of Defense's Enemy Combatant Notice (ECN) that was distributed to detainees expressly stated that a detainee could have a "family member or friend" file a habeas petition on the detainee's behalf. Because these are men who are not familiar with the U.S. legal system and customs, and because it is so difficult for these prisoners to have a family member perform this task, I am acting as their friend. They are both from Syria and each has been held at this prison for four to five years without access to legal counsel:

| DOKHAN, MOAMMAR BADAWI |
| MOUHAMMAD, MAASOUM ABDAH |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the __ day of December, 2006.

_____

Sami al Hajj

# FOUO

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioner Dokhan hereby certify, pursuant to L. Cv. R. 83.2(g), that they are representing Petitioner Dokhan without compensation.

Dated: June 9, 2008

Kristine A. Huskey
D.C. Bar ID #462979
National Security & Human Rights Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Tel: 512-232-3657
Fax: 512-471-8478

Shayana D. Kadidal
D.C. Bar ID #454248
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Tel: 212-614-6438
Fax: 212-614-6499

## CERTIFICATE OF SERVICE

I hereby certify that, on this ninth day of June, 2008, I caused a true and correct copy of the **PETITION FOR A WRIT OF HABEAS CORPUS** to be served on the following persons via First Class Certified Mail Return, Receipt Requested:

**Kenneth L. Wainstein**
U.S. ATTORNEY
District of Columbia District
Judiciary Center
555 4th Street, NW
Washington, D.C. 20530

**Michael B. Mukasey**
ATTORNEY GENERAL OF THE UNITED STATES
U.S. Department of Justice
Robert F. Kennedy Building
Tenth Street & Constitution Ave., NW
Room 5111
Washington, D.C. 20530

**George W. Bush**
PRESIDENT, UNITED STATES OF AMERICA
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20301-1000

**Robert M. Gates**
SECRETARY, U.S. DEP'T OF DEFENSE
1000 Defense Pentagon
Washington, D.C. 20301-1000

**Rear Admiral David M. Thomas, Jr.**
COMMANDER, JOINT TASK FORCE-GTMO
JTF-GTMO
APO AE 09360

**Rear Admiral David M. Thomas, Jr.**
UNITED STATES NAVY
Navy Pentagon
Washington, D.C. 20350-0200

**Army Col. Bruce Vargo**
COMMANDER, JDOG
JTF-GTMO
APO AE 09360

**Army Col. Bruce Vargo**
UNITED STATES ARMY
Army Pentagon
Washington, D.C. 20310-0200

**Terry M. Henry**
**Andrew I. Warden**
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: 202-514-4938
Fax: 202-616-8470

_____
Kristine A Huskey

## I (a) PLAINTIFFS

Moammar Badawii Dokhan,
Sami al Hajj (next friend),

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 99999
**(EXCEPT IN U.S. PLAINTIFF CASES)**

99999 (Guantanamo)

**DEFENDANTS** George Bush, Robert Gates,
Rear Admiral David M Thomas, Bruce Vargo

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Kristine A Huskey (512)232-36
National Security & Human Rights Clinic
University of Texas School of Law
Austin, TX 78705

Case: 1:08-cv-00987
Assigned To : Bates, John D.
Assign. Date : 6/9/2008
Description: TRO/PI

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

□ 3 Federal Question (U.S. Government Not a Party)

⊗ 2 U.S. Government Defendant

□ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**□ A. Antitrust**

□ 410 Antitrust

**□ B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**□ C. Administrative Agency Review**

□ 151 Medicare Act

**Social Security:**
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

**⊗ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**□ E. General Civil (Other) OR □ F. Pro Se General Civil**

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Immigration**
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien Detainee
□ 465 Other Immigration Actions

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or defendant)

□ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

| ☐ **G. Habeas Corpus/ 2255** | ☐ **H. Employment Discrimination** | ☐ **I. FOIA/PRIVACY ACT** | ☐ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K. Labor/ERISA (non-employment)** | ☐ **L. Other Civil Rights (non-employment)** | ☐ **M. Contract** | ☐ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2241

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  **DEMAND $** ____  Check YES only if demanded in complaint  **JURY DEMAND:** ☐ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES  ☐ NO  If yes, please complete related case form.

DATE 6-09-08  SIGNATURE OF ATTORNEY OF RECORD  *Kristine A. Huskey*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Forms\js-44.wpd