## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MOAMMAR BADAWI DOKHAN** | ) |
| | ) |
| and | ) |
| | ) |
| **SAMI AL HAJJ,** | ) |
| as Next Friend of | ) |
| Moammar Badawi Dokhan | ) |
| | ) |
| *Petitioners/Plaintiffs,* | ) |
| *v.* | ) **CIVIL ACTION NO. _____** |
| | ) |
| **GEORGE W. BUSH**, *et al.*, | ) |
| | ) |
| *Respondents.* | ) |
| | ) |

## MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH THIRTY-DAYS ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the All Writs Act, 28 U.S.C.

§ 1651, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

or Punishment ("CAT"), Petitioner Moammar Badawi Dokhan, ISN 317, respectfully moves for

an order requiring Respondents to provide counsel for Petitioner and the Court with thirty-days

notice of any intended removal of Petitioner from Guantánamo Bay Naval Station in Cuba

("Guantánamo") and to specify in the thirty-days notice the country to which they intend to

transfer Petitioner.  On information and belief, Respondents have contemplated or are contem-

plating removing Petitioner to his native Syria or another foreign country where he faces a sub-

stantial likelihood of torture.  Petitioner requests this requirement of advance notice to allow Pe-

titioner to seek relief from this Court if necessary and allow this Court to preserve its habeas ju-

risdiction pending a decision by the Supreme Court in *Boumediene v. Bush*, 476 F.3d 981 (D.C.

Cir. 2007), *cert. granted*, 127 S. Ct. 3078 (2007). Under the D.C. Circuit's recent decision in *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), this Court has jurisdiction to issue a preliminary injunction requiring Respondents to provide such thirty-days notice and to grant other preliminary relief that it deems appropriate.

Due to restrictions Respondents have placed on Petitioner Dokhan's access to counsel, undersigned counsel have thus far been unable to meet with Petitioner. Because of the overwhelming evidence that an individual in Petitioner's shoes would face a substantial likelihood of torture if transferred to Syria, counsel for Petitioner file the present Motion while reserving the right to amend and/or supplement as necessary once counsel have had an opportunity to meet with Petitioner.

## BACKGROUND

### A. Petitioner Is Detained At Guantánamo and Is In Danger of Being Transferred To A Country Where He Faces Torture

On information and belief, Petitioner Dokhan is a citizen of Syria who has been detained as an "enemy combatant" without charge or trial at Guantánamo. As detailed in the habeas petition he has filed, his detention is in violation of the Constitution, treaties, and laws of the United States. On information and belief, Petitioner has reason to fear that he will be transferred to his native Syria or another country where he will be tortured.

For years, the press has reported on Pentagon plans to transfer more than half of the detainees at Guantánamo to countries with records of human rights abuses. *See* Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. Times, Mar. 11, 2005, *available at* http://www.nytimes.com/2005/03/11/politics/11detain.html. The government now appears to be executing that plan. Recent press reports regarding mounting pressures to close the detention facilities at Guantánamo place Petitioner Dokhan in grave danger of being moved to

his native Syria or another country that practices torture. *See, e.g.*, Andrew Gray, *U.S. Efforts to Close Guantanamo at Standstill—Gates*, Reuters, May 20, 2008, *available at* http://www.reuters.com/article/latestCrisis/idUSN20343601, (citing Defense Secretary Robert Gates' desire to close Guantánamo and transfer many of the remaining prisoners to their home countries); Jeffrey Toobin, *Camp Justice*, New Yorker, Apr. 14, 2008, *available at* http://www.newyorker.com/reporting/2008/04/14/080414fa_fact_toobin ("All three remaining candidates for President, the Republican John McCain and the Democrats Hillary Clinton and Barack Obama, have called for Guantánamo to be closed. So have Condoleezza Rice, the Secretary of State, and Robert M. Gates, the Secretary of Defense; after touring Guantánamo in January, Admiral Mike Mullen, the chairman of the Joint Chiefs of Staff, said, 'I'd like to see it shut down.'"). Within the last year, dozens of detainees have been transferred to foreign governments with records of torture and human rights abuses, including Saudi Arabia, Afghanistan, and Yemen, among others. *See* Press Releases, Dep't of Defense, Detainee Transfer Announced (June 19, 2007; July 16, 2007; Sept. 6, 2007; Sept. 28, 2007; Sept. 29, 2007; Nov. 4, 2007; Nov. 11, 2007, Dec. 12, 2007). In its December 12, 2007 press release, the United States Department of Defense stated that "more than 70 detainees at Guantánamo are eligible for transfer or release," which amounts to around a fourth of the prison population. Press Release, Detainee Transfer Announced, Dec. 12, 2007, *available at* http://www.defenselink.mil/releases/release.aspx?releaseid=11555.

　　Further, the United States has secretly removed detainees and others suspected of terrorist activities to other countries to be interrogated or detained without complying with extradition laws or other processes. According to reports by American and foreign news organizations, including the *Washington Post*, the *Los Angeles Times*, and the British Broadcasting Corporation,

3

the United States government has repeatedly transferred detainees into the custody of foreign

governments that employ inhumane interrogation techniques.  According to an article in the *New

Yorker*, this "rendition" process was originally "a program aimed at a small, discrete set of sus-

pects – people against whom there were outstanding foreign arrest warrants," but after Septem-

ber 11 came to include a "wide and ill-defined population that the Administration terms 'illegal

enemy combatants.'"  Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, *available

at* http://www.newyorker.com/archive/2005/02/14/050214fa_fact6?printable=true.  According to

the *Washington Post*:

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected
> of links to terrorists to countries other than the United States, bypassing extradition pro-
> cedures and legal formalities, according to Western diplomats and intelligence sources.
> The suspects have been taken to countries . . . whose intelligence services have close ties
> to the CIA and where they can be subjected to interrogation tactics – including torture
> and threats to families – that are illegal in the United States, the sources said.  In some
> cases, U.S. intelligence agents remain closely involved in the interrogation, the sources
> said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post,

Mar. 11, 2002, at A1.  The countries to which detainees have been rendered by U.S. authorities

are known to practice torture, including Petitioner Dokhan's native Syria.  *See, e.g.*, Megan K.

Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture*, L.A. Times, Jan. 13,

2005, at A1 ("News accounts, congressional testimony and independent investigations sug-

gest[the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria,

Jordan and other Middle Eastern nations where, according to State Department reports, torture

has been widely used on prisoners.").

On information and belief there is a substantial likelihood that Petitioner Dokhan is

among the detainees slated for transfer.  Further, on information and belief Petitioner Dokhan has

4

reason to fear that he will be transferred into the custody of the government of Syria or another country where he will be tortured.

**B.      Petitioner Dokhan Is Likely To Face Torture Should He Be Transferred To His Native Syria**

On information and belief, Petitioner Dokhan is a citizen of Syria and has reason to fear torture at the hands of the Syrian government should he be transferred to Syria. Syria has a well-documented history of human rights abuses. The U.S. State Department's *Country Reports on Human Rights Practices – 2007*, dated March 11, 2008, for Syria documents serious human rights abuses by the Syrian government, including arbitrary and unlawful killings, and torture and physical abuse of prisoners by the Syrian security forces. *See* Syria, Country Reports on Human Rights Practices – 2007, *available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100606.htm (Mar. 11, 2008). The State Department's report notes that during 2007 "three persons died in detention following torture or mistreatment by security services." *Id.* The report further notes that "security forces continued to use torture frequently." *Id.*   According to the report:

> Former prisoners, detainees, and reputable local human rights groups reported that methods of torture and abuse included electrical shocks; pulling out fingernails; burning genitalia; forcing objects into the rectum; beating, sometimes while the victim was suspended from the ceiling; alternately dousing victims with freezing water and beating them in extremely cold rooms; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; using a backward-bending chair to asphyxiate the victim or fracture the victim's spine; and stripping prisoners naked for public view. Throughout the previous years, the international NGO Amnesty International (AI) has documented 38 types of torture and ill-treatment used against detainees in the country. AI reported that torture was most likely to occur while detainees were held at one of the many detention centers operated by the various security services in the country, particularly while authorities attempted to extract a confession or information. Courts systematically used "confessions" extracted under duress as evidence, and the defendants' claims of torture were almost never investigated.

*Id.*

Similarly, the most recent country report on Syria from Amnesty International observes that "[t]orture and ill-treatment in detention continued to be reported and carried out with impunity." Amnesty International USA, *2007 Annual Report for Syria*, *available at* http://www.amnestyusa.org/annualreport.php?id=ar&yr=2007&c=SYR. The report further identifies three prisoners who have reportedly been tortured in Syrian custody, including one who died in custody in Damascus as a result of torture and ill-treatment during his six months of detention. *Id.*

U.S. authorities have already transferred at least one individual to Syria without legal process, Canadian citizen Maher Arar. While in Syria, Mr. Arar was imprisoned and repeatedly tortured by Syrian authorities. As the *New York Times* has reported,

> The Syrian-born Mr. Arar was seized on Sept. 26, 2002, after he landed at Kennedy Airport in New York on his way home from a holiday in Tunisia. On Oct. 8, he was flown to Jordan in an American government plane and taken overland to Syria, where he says he was held for 10 months in a tiny cell and beaten repeatedly with a metal cable. He was freed in October 2003, after Syrian officials concluded that he had no connection to terrorism and returned him to Canada.

Ian Austin, *Canadians Fault U.S. for Its Role in Torture*, N.Y. Times, Sept. 19, 2006, *available at* http://www.nytimes.com/2006/09/19/world/americas/19canada.html. Mr. Arar's transfer by U.S. authorities to Syria and torture by Syrian authorities was confirmed by a 2006 report of a special Canadian government commission headed by Justice Dennis R. O'Connor, Associate Chief Justice of Ontario. *See Report of the Events Relating to Maher Arar: Analysis and Recommendations* 9 (2006), *available at* http://www.ararcommission.ca/eng/AR_English.pdf ("On September 26, 2002, while passing through John F. Kennedy International Airport in New York, Mr. Arar was arrested and subsequently detained by American officials for 12 days. He was then removed against his will to Syria, the country of his birth, where he was imprisoned for nearly a year. While in Syria, Mr. Arar was interrogated, tortured and held in degrading and inhumane

6

conditions."). Mr. Arar was tortured by Syrian authorities notwithstanding the fact that U.S. of-

ficials obtained assurances from Syria that Mr. Arar would not be tortured. *See* Dana Priest,

*Man Was Deported After Syrian Assurances*, Wash. Post, Nov. 20, 2003, at A24.

Based on the well-documented record of torture and human rights abuses of the Syrian

government and the record of U.S. authorities in transferring individuals to Syria and other coun-

tries known to practice torture, Petitioner Dokhan may have reason to fear persecution and tor-

ture should he be returned to Syria.

## ARGUMENT

### A.    The Convention Against Torture Prohibits The United States From Trans-
### ferring Petitioner Dokhan To A Country Where He Is Likely To Be Tortured

"Among the rights universally proclaimed by all nations . . . is the right to be free of

physical torture." *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980). It is well estab-

lished that the ban on torture is *jus cogens*, in other words, "a norm accepted and recognized by

the international community of states as a whole as a norm from which no derogation is permit-

ted." *de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992). This central and ba-

sic norm of international law "may well restrain our government in the same way the Constitu-

tion restrains it." *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 941

(D.C. Cir. 1988). The *jus cogens* nature of the prohibition on torture has been widely recognized

by U.S. courts. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (approving of the

prohibition on torture as an international norm of such definition and wide acceptance as to pro-

vide a cause of action under the Alien Tort Claims Act); *Cornejo-Barreto v. Seifert*, 218 F.3d

1004, 1016 (9th Cir. 2000) ("The individual's right to be free from torture is an international

standard of the highest order. Indeed, it is a *jus cogens* norm: the prohibition against torture may

never be abrogated or derogated."); *Filartiga*, 630 F.2d at 890 ("[F]or purposes of civil liability,

7

the torturer has become—like the pirate and slave trader before him—*hostis humani generis*—an enemy of all mankind.").

Pursuant to Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), a convention to which the United States is a signatory, the Senate has ratified, and which has been implemented in the United States:

1.    No State shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2.    For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, art. 3.[1]

---

[1]    In addition to CAT, the United States is a signatory to various other international instruments that prohibit torture. In 1992, the United States ratified the International Covenant on Civil and Political Rights [hereinafter ICCPR], Article 7 of which provides that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." ICCPR, adopted Dec. 16, 1966, S. Exec. Doc. No. E, 95-2 (1978), 999 U.N.T.S. 171. The United States Senate ratified the ICCPR in 1992, with the following reservation: "[T]he United States considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." S. Exec. Rep. No. 102-23, at 22 (1992).

Torture is also prohibited by the Geneva Conventions of 1949, to which the United States is a signatory. Article 17 of the Third Geneva Convention provides that "[n]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever." Geneva Convention Relative to the Treatment of Prisoners of War, opened for signature Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, art. 17. In addition, Common Article 3, which appears in all four Geneva Conventions, provides that "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms . . . shall in all circumstances be treated humanely." *Id.* art. 3. Further, Common Article 3 prohibits with respect to all covered persons the following acts: "violence to life and person, in particular murder of all kinds, mutila-
(continued...)

In 1998, Congress enacted the Foreign Affairs Reform and Restructuring Act

("FARRA"), section 2242(a) of which implemented the United States' nonrefoulement obliga-

tions under Article 3 of CAT.  FARRA, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681-761,

2681-822 (codified as note to 8 U.S.C. § 1231).  FARRA provides that it is "the policy of the

United States not to expel, extradite or otherwise effect the involuntary return of any person to a

country in which there are substantial grounds for believing the person would be in danger of

being subjected to torture, regardless of whether the person is physically present in the United

States."  FARRA § 2242(a).[2]

CAT has been implemented by FARRA and accompanying regulations.  Because

FARRA makes it federal law that no one shall be returned to a country where he faces a substan-

tial likelihood of torture, an individual whose detention violates FARRA may challenge his de-

tention under the habeas statute.  *See* 28 U.S.C. § 2241(c)(3) (providing that writs of habeas cor-

pus may be granted to a prisoner who is "in custody in violation of the Constitution or laws or

treaties of the United States"); *see also Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 220 (3rd Cir.

2003) ("[I]ndividuals whose detention violates FARRA may challenge their detention under 28

---

tion, cruel treatment and torture," and "outrages upon personal dignity, in particular[,] humiliating and degrading treatment." *Id.*

    The prohibition of torture is also found in other international documents that codify international norms. *See, e.g.*, Universal Declaration of Human Rights, art. 5, G.A. Res. 217A (III), U.N. Doc. A/810 (Dec. 12, 1948) ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); American Declaration of the Rights and Duties of Man, art. XXV – XXVI, O.A.S. Official Rec., OEA/Ser. L./V./II.23, doc. 21, rev. 6 (1948).

[2]    In pursuance of its obligations under CAT, the United States has also enacted legislation forbidding torture outside of the United States by persons subject to U.S. jurisdiction. 18 U.S.C. § 2340. The anti-torture statue makes it an offense punishable by up to twenty years imprisonment to commit, conspire to commit, or attempt torture, and an offense punishable by death if the torture victim dies as a result. *Id.* § 2340A(a), (c). The criminal anti-torture statute is complemented by civil liability under the Torture Victim Protection Act of 1991 ("TVPA"), which provides for civil damages suits in U.S. courts against individuals who "under actual or apparent authority, or color of law, of any foreign nation" subject an individual to torture or extrajudicial killing. 28 U.S.C. § 1350 note § 2.

U.S.C. § 2241, just as with any other detentions that violate federal law."); *Wang v. Ashcroft*, 320 F.3d 130, 141 n. 16 (2nd Cir. 2003) ("Once Congress created rights under CAT by enacting FARRA, § 2241 necessarily became a proper avenue of relief for individuals in custody in violation of FARRA and its implementing regulations."); *see also Omar v. Harvey*, 479 F.3d 1, 10 (D.C. Cir. 2007) (holding that writ of habeas corpus may be used to challenge transfer of U.S. citizen held in Iraq to custody of Iraqi court for trial). Further, the D.C. Circuit recently recognized in its *Belbacha* decision that, if the Supreme Court holds in *Boumediene* that Guantánamo detainees may petition for writs of habeas corpus, then a detainee may be able to bring a CAT-based challenge to his transfer in a habeas action. *See Belbacha*, 520 F.3d at 456.

**B.    Petitioner Dokhan Satisfies The Criteria For Preliminary Injunctive Relief**

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner Dokhan's request meets the most fundamental purpose of preliminary injunctive relief: "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004). The D.C. Circuit recently held that, during the pendency of the Supreme Court's review in *Boumediene*, this Court has jurisdiction to issue preliminary injunctions under the All Writs Act to preserve the status quo in habeas cases. *Belbacha*, 520 F.3d at 459.

Each of the four factors to be weighed in awarding preliminary injunctive relief favors the Petitioner's request for thirty-days notice of transfer: (1) Petitioner Dokhan will suffer irreparable harm if the injunction is denied; (2) little or no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner Dokhan is likely to succeed on the merits of his claims;

and (4) there is a clear public interest in preventing the U.S. government from violating clear in-
ternational and domestic laws by rendering individuals to foreign countries for illegal detention
and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc.
v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). These factors are balanced on a sliding
scale; "[i]f the arguments for one factor are particularly strong, an injunction may issue[.]" *Se-
rono Labs*, 158 F.3d at 1318.

        Petitioner Dokhan's request should be granted because he faces a clear and present threat
of severe and irreparable harm if transferred. He faces prospective harm of two types: personal
bodily harm and legal harm. First, Petitioner Dokhan may suffer immeasurable and irreparable
personal bodily harm—including torture or possibly death—at the hands of Syria or another for-
eign government. The history of arbitrary arrest, abuse, and torture by the Syrian government is
well documented. Second, Petitioner Dokhan will be harmed legally if transferred, as transfer to
another country circumvents his right to adjudicate the legality of his detention and his status as
an "enemy combatant" in this Court. The severity of the harm Petitioner Dokhan would suffer if
transferred weighs heavily in favor of granting his request for 30-days notice.

        By contrast, Respondents, who have already held Petitioner Dokhan for years, need only
to provide counsel and this Court with adequate notice of any intended removal of Petitioner
Dokhan from Guantánamo. This request does not place a substantial burden on Respondents,
and Respondents can suffer no conceivable harm from complying with this request.

        The District Court for the District of Columbia has already issued orders requiring Re-
spondents to give Guantánamo prisoners and their counsel advance notice of any transfer from
U.S. custody. Most recently, the District Court in *Mohammon v. Bush* entered a preliminary in-
junction barring the government from transferring a Tajikistani detainee to any country without

thirty-days notice and also ordered the government to identify the country to which it intended to

transfer the detainee. *See* Order, No. 05-2386 (RBW) (D.D.C. Mar. 19, 2008). Similarly, in *Ab-*

*dah v. Bush*, the District Court granted the motion of Yemeni petitioners for thirty-days notice of

an intended transfer of petitioners from Guantánamo. No. 04-1254, 2005 U.S. Dist. LEXIS 4942

(D.D.C., Mar. 29, 2005). And in *Rohullah v. Gates*, the District Court ordered the government to

give Rohullah's counsel thirty-days notice before transferring him from Bagram Air Force Base

to Afghan custody. No. 06-1707 (D.D.C. Nov. 3, 2007).

In addition, Petitioner Dokhan is likely to succeed on the merits of his underlying habeas

petition. First, Petitioner Dokhan has properly invoked the jurisdiction of this Court. *See Rasul*

*v. Bush*, 124 S. Ct. 2686, 2698 (2004). Recent developments in the Supreme Court support this

conclusion. The Supreme Court granted certiorari and heard argument on the very issue of

whether federal courts retain jurisdiction over habeas petitions filed by Guantánamo detainees in

December 2007 in *Boumediene v. Bush*, after initially denying certiorari. 127 S. Ct. 3078. Be-

cause the Supreme Court may rule in favor of the detainees, this Court has the right to protect its

jurisdiction by barring Respondents from transferring Petitioner Dokhan to the custody of an-

other country. Second, Petitioner Dokhan is likely to prevail on the merits of a challenge under

the habeas statute to his transfer to a country where he is likely to be tortured. Any such transfer

would violate federal law under FARRA and basic international legal norms embodied in the

Convention Against Torture.

Finally, public policy favors requiring Respondents to provide advance notice to counsel

and the Court of any intended removal of Petitioner from the Court's jurisdiction. The public

good requires that a federal litigant—properly before the Court and represented by counsel—be

provided with a meaningful opportunity to contest his transfer into the hands of those who might

torture him. Moreover, the relief requested is entirely consistent with the U.S. State Department's stated policy of vigorously enforcing the protections of Article 3 of the Convention Against Torture regardless of the status of the individual at risk. *See Report of the United States to the Committee Against Torture*, ¶ 38, CAT/C/48/Add.3/Rev.1 (Jan. 13, 2006) ("The United States remains committed to providing Article 3 protection to all aliens in its territory who require such protection, and recognizes that there are no categories of aliens who are excluded from protection under Article 3."). Any transfer of Petitioner Dokhan to a country where he is likely to be tortured would violate basic international legal norms embodied in the Geneva Conventions, the International Covenant on Civil and Political Rights, the Convention Against Torture, the Universal Declaration of Human Rights, and the American Declaration of the Rights and Duties of Man.

The relief Petitioner requests will not impede Respondents' efforts to transfer Petitioner to an appropriate location. In cases where a prisoner is being transferred to an acceptable location, alternative agreements have been negotiated to accelerate the thirty-day period. Petitioner Dokhan only requests this order to provide a means of seeking relief from this Court before he is transferred to a place where he is likely to be tortured.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, this Court should grant Petitioner's motion for thirty-days notice of any intended removal of Petitioner from Guantánamo to any other country, require Respondents to specify in the thirty-days notice the country to which they intend to transfer Petitioner, and grant Petitioner any such other relief the Court deems appropriate.

Dated: June 9, 2008              .              Respectfully submitted,

                                              Counsel for Petitioner:

13

Kristine A. Huskey
D.C. Bar #462979
National Security & Human Rights Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Tel: 512-232-3657
Fax: 512-232-0800


Shayana D. Kadidal
D.C. Bar ID #454248
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York  10012
Tel: 212-614-6438
Fax: 212-614-6499

14

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2008, I caused a true and correct copy of the **MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH THIRTY-DAYS ADVANCE NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO**

to be served on the following persons via First-Class Certified U.S. Mail:

> **Terry M. Henry**
> **Andrew I. Warden**
> Attorneys
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W.
> Washington, DC 20530
> Tel: 202-514-4938
> Fax: 202-616-8470

Kristine A. Huskey
D.C. Bar #462979
National Security & Human Rights Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX 78705
Tel: 512-232-3657
Fax: 512-232-0800

Counsel for Petitioner

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOAMMAR BADAWI DOKHAN** )<br><br>and )<br><br>**SAMI AL HAJJ,** )<br>      as Next Friend of )<br>      Moammar Badawi Dokhan )<br><br>      *Petitioners/Plaintiffs*, )<br>              *v.* )<br><br>**GEORGE W. BUSH**, *et al.*, )<br><br>      *Respondents.* ) | **CIVIL ACTION NO.** _____ |

## ORDER

It is hereby:

**ORDERED** that Petitioner's motion for Respondents to provide counsel for Petitioner and the Court with thirty-days notice of any intended removal of Petitioner from Guantánamo to any other country is **GRANTED**.  It is further

**ORDERED** that Petitioner's motion for Respondents to specify in their thirty-days notice the country to which they intend to transfer Petitioner is **GRANTED**.

**SO ORDERED**.

_____

United States District Judge